COZEN O'CONNOR
Valerie D. Rojas (State Bar No. 180041)
vrojas@cozen.com
601 S. Figueroa Street, Suite 3700
Los Angeles, CA 90017
Telephone: 213.892.7900
Facsimile: 213.892.7999

Michael D. Rafalko *(Pro Hac Vice to be filed)*
Allison B. Goldis *(Pro Hac Vice to be filed)*
mrafalko@cozen.com/agoldis@cozen.com
One Liberty Place
1650 Market Street, Suite 2800
Philadelphia, PA 19103
Telephone: 215.665.4611 / 215.665.7241
Facsimile: 215.372.2360/ 267.507.1546

Attorneys for Plaintiff
TRANSAMERICA LIFE INSURANCE COMPANY

# UNITED STATES DISTRICT COURT

# FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| TRANSAMERICA LIFE INSURANCE COMPANY, <br><br> *Plaintiff,* <br><br> v. <br><br> JAMES RICHARDS and CHRISTOPHER GURICH, <br><br> *Defendants*. | Civil Action No.: <br><br> **PLAINTIFF TRANSAMERICA LIFE INSURANCE COMPANY'S COMPLAINT FOR DAMAGES AND DECLARATORY RELIEF** |

Plaintiff, Transamerica Life Insurance Company as successor by merger to Transamerica Occidental Life Insurance Company (together, "Transamerica"), acting by and through its counsel, the Cozen O'Connor firm, files this complaint for damages and declaratory relief against James Richards ("Richards") and his son-in-law, Christopher Gurich ("Gurich," together with Richards, "Defendants"), and in support thereof, states the following:

## PARTIES

1.      Transamerica is an insurance company organized and existing under the laws of the State of Iowa with its principal place of business in Cedar Rapids, Iowa, and is therefore deemed to be a citizen of the State of Iowa.

COZEN O'CONNOR
601 S. FIGUEROA STREET, SUITE 3700
LOS ANGELES, CA 90017

2.      Richards is an adult individual residing in Malibu, California, and is a citizen of the State of California.

3.      Gurich is an adult individual residing in Thousand Oaks, California, and is a citizen of the State of California.

## JURISDICTION AND VENUE

4.      Jurisdiction is proper in this Court pursuant to 28 U.S.C. § 1332, because the dispute is between citizens of different states and the amount in controversy exceeds the sum of $75,000.00, exclusive of interest and costs.

5.      Venue is proper in the United States District Court for the Central District of California pursuant to 28 U.S.C. § 1391(b)(1) because the Central District of California is the judicial district in which Defendants reside.

6.      Venue is also proper in the United States District Court for the Central District of California pursuant to 28 U.S.C. § 1391(b)(2) because the Central District of California is the judicial district in which a substantial part of the acts and omissions giving rise to Transamerica's claims against Defendants occurred.

## FACTS COMMON TO ALL COUNTS

7.      This is an action in which Transamerica alleges fraud, civil conspiracy and other causes of action against Defendants in connection with a claim for benefits under a long-term care insurance certificate issued by Transamerica.

8.      Richards is insured under the aforementioned long-term care insurance certificate. Richards' stepson, Gurich, purports to have been Richards' paid caregiver in accordance with Richards' claim under the certificate and Transamerica's payment of benefits.

9.      Defendants represented to Transamerica for more than two years that Richards was entitled to be paid benefits under the certificate for care services he allegedly received from Gurich in the home each day due to certain functional limitations from which Richards claimed to suffer.

COZEN O'CONNOR
601 S. FIGUEROA STREET, SUITE 3700
LOS ANGELES, CA 90017

10.     In fact, Defendants conspired to defraud Transamerica of $269,452.20 of insurance benefits in connection with the claim.  They did this in two ways, each of which independently qualifies as fraud under the law.

11.     First, they represented to Transamerica that Richards met the benefit eligibility triggers in the certificate due to functional limitations that led Richards to require daily care from a caregiver in the home.  In fact, Richards did not require care in the home.  Defendants were fully aware that their representations to Transamerica regarding Richards' functionality were false.  This was fraud.

12.     Second, Defendants submitted or caused to be submitted to Transamerica certain Proof of Loss and other papers and information in which they represented that Richards received paid care services from Gurich in the home on certain dates and at certain times in order to induce Transamerica to pay benefits.  These submissions were replete with known falsehoods.  Transamerica performed seven periods of surveillance on Richards plus an additional three periods of surveillance on Gurich over the course of a two-year investigation.  During these many periods of surveillance, Gurich was never once seen providing care to Richards.  In fact, despite both Defendants being active in the community almost daily, Richards and Gurich were almost never seen outside the home together except on those dates when Transamerica required Richards to undergo an independent medical examination ("IME") in a doctor's office – *i.e.*, dates on which Gurich needed to accompany Richards to the IME in order to give the doctor performing the IME and, by extension, Transamerica the false impression that Richards needed care and received care he did not actually need or receive.  This was fraud.

13.     By knowingly misrepresenting facts concerning Richards' functionality and alleged receipt of and payment for care services, Defendants fraudulently induced Transamerica to pay long-term care insurance benefits Defendants were not lawfully entitled to receive.

COZEN O'CONNOR
601 S. FIGUEROA STREET, SUITE 3700
LOS ANGELES, CA 90017

**A.**    **The Insurance Certificate at Issue in this Action**

14.    On or about October 1, 2001, Transamerica issued a Comprehensive Long Term Care Insurance Certificate, No. 890928864 (the "Certificate"), to Richards. A true and correct copy of the Certificate, excluding the Application (which contains Protected Health Information under the HIPAA statute), is attached hereto as **Exhibit A**.

15.    The Certificate provides coverage for Home Health Care, meaning "skilled nursing or other professional services provided in Your Home."

16.    In order to qualify for the Home Health Care Benefit, Richards must be "Unable to Perform two or more Activities of Daily Living ["ADLs"] (bathing, dressing, eating, toileting, transferring, continence and ambulating)…"

17.    Unable to Perform an ADL means that "[Richards] cannot perform it without the actual, supervisory or directional assistance of another person."

18.    Notably, benefits under the Certificate were only triggered if Richards incurred actual expenses for care services rendered. This means that Richards needed to receive care in exchange for money, then submit invoices and other Proof of Loss to Transamerica in order for benefits to be paid.

**B.**    **Richards' Claim for Benefits under the Certificate**

19.    On or about August 9, 2018, Richards initiated a claim for benefits under the Certificate. He identified balance issues and falls as the basis for the claim.

20.    On August 16, 2018, Richards underwent an onsite assessment in his home with an independent nurse who was not employed by or affiliated with Transamerica. The purpose of the onsite assessment was to assist Transamerica in determining whether Richards was eligible to receive benefits under the Certificate.

21.    During the onsite assessment, Richards represented to the assessor that he was Unable to Perform two of the seven ADLs defined in the Certificate.

22.    During the onsite assessment, Richards represented to the assessor that he could no longer drive a car or shop for groceries.

COZEN O'CONNOR
601 S. FIGUEROA STREET, SUITE 3700
LOS ANGELES, CA 90017

23.    During the onsite assessment, Richards also identified Gurich as his paid caregiver.

24.    Ordinarily, Gurich would not be able to provide covered care to Richards because he is Richards' stepson and, therefore, is a member of Richards' Immediate Family as defined in the Certificate – a class of persons who are ineligible to provide covered care.  Gurich, however, ostensibly fell within an exception to this exclusion. Defendants represented to Transamerica that Gurich was regularly employed by Right at Home, a home health care agency that is in the business of facilitating long-term care services for individuals in need.  Immediate Family members who held this kind of regular employment were permitted to provide covered care.

25.    On information and belief, Gurich had his own residence that was separate from Richards' residence at the outset of the claim.  Gurich, however, moved into and became a fulltime resident of Richards' home shortly after the claim was initiated.

26.    Based on Defendants' representations to Transamerica, Transamerica approved Richards' claim and began paying benefits.

**C.    Transamerica's Claim Investigation**

27.    Beginning in 2019, Transamerica determined that it was necessary and appropriate to investigate the claim for benefits.

**1.    Transamerica's First Period of Surveillance**

28.    In April and May 2019, Transamerica performed a first period of surveillance on Richards.  On each date of surveillance, Defendants represented to Transamerica in Proof of Loss statements that Richards received nine hours of paid services from Gurich in the home.  These Proof of Loss statements included the times each day when Gurich allegedly provided care, plus a written description of the specific care services Gurich allegedly provided.  As with all Proof of Loss statements at issue in this litigation, these submissions were provided by Defendants to Right at Home with knowledge and intent that Right at Home would cause them to be

COZEN O'CONNOR
601 S. FIGUEROA STREET, SUITE 3700
LOS ANGELES, CA 90017

transmitted to Transamerica in support of the claim, and that Transamerica would rely on them to pay benefits to Richards. Acting in reliance on these Proof of Loss statements, Transamerica did, in fact, pay benefits to Richards.

29. Transamerica's surveillance revealed that, despite allegedly suffering from significant functional limitations, Richards was regularly outside the home alone, often for extended periods of time on dates and at times when Defendants represented to Transamerica that Gurich was providing paid care to Richards in the home. Similarly, Gurich was often away from the home during time periods when Defendants represented that Gurich was providing care to Richards in the home. Transamerica was falsely induced to pay benefits for these time periods because covered care services were not actually being provided. In fact, Defendants were never once seen together on any date or at any time during the entire period of surveillance.

30. Moreover, the video showed Richards behaving with a higher degree of independence and functionality than represented to Transamerica. He performed movements and tasks directly analogous to ADLs without assistance. The video was inconsistent with the notion that Richards was Unable to Perform any of his ADLs.

**2.    Richards Undergoes an Independent Medical Examination**

31. Transamerica determined that it was necessary and appropriate to schedule Richards for an IME in accordance with Transamerica's rights under the Certificate.

32. The IME took place on May 10, 2019 with Dr. Marvin Pietruszka, who is board certified in both Occupational Medicine and Anatomic and Clinical Pathology, and who had no prior relationship with Richards or Transamerica.

33. Based largely on Richards' subjective representations during the IME, Dr. Pietruszka opined that Richards was Unable to Perform two ADLs.

34. In light of Dr. Pietruszka's opinion, Transamerica continued to pay benefits while it investigated the claim further.

COZEN O'CONNOR
601 S. FIGUEROA STREET, SUITE 3700
LOS ANGELES, CA 90017

### 3.    Transamerica's Second Period of Surveillance

35.    Transamerica performed a second period of surveillance on Richards in May 2019, including the date of the IME and days before and after the IME.  On each date of surveillance, Defendants represented to Transamerica in Proof of Loss statements that Richards received between seven and nine hours of paid care services from Gurich in the home.  These Proof of Loss statements included the times each day when Gurich allegedly provided care, plus a written description of the specific care services Gurich allegedly provided.  As with all Proof of Loss statements at issue in this litigation, these submissions were provided by Defendants to Right at Home with knowledge and intent that Right at Home would cause them to be transmitted to Transamerica in support of the claim, and that Transamerica would rely on them to pay benefits to Richards.  Acting in reliance on these Proof of Loss statements, Transamerica did, in fact, pay benefits to Richards.

36.    Transamerica's surveillance revealed that, despite allegedly suffering from significant functional limitations, Richards was regularly outside the home alone, often for extended periods of time on dates and at times when Defendants represented to Transamerica that Gurich was providing paid care to Richards in the home.  Transamerica was falsely induced to pay benefits for these time periods because covered care services were not actually being provided.

37.    Moreover, the video showed Richards behaving with a higher degree of independence and functionality than represented to Transamerica.  He performed movements and tasks directly analogous to ADLs without assistance.  The video was inconsistent with the notion that Richards was Unable to Perform any of his ADLs.

38.    Curiously, the only date during the second surveillance period when Richards and Gurich were seen together was on May 10 – the date of the IME.  Gurich accompanied Richards to the IME.  This was done to give Dr. Pietruszka and, in turn, Transamerica the false impression that Richards needed and was receiving care from Gurich as represented to Transamerica.  Aside from accompanying Richards to the

COZEN O'CONNOR
601 S. FIGUEROA STREET, SUITE 3700
LOS ANGELES, CA 90017

IME, Gurich and Richards were not seen together on any date or at any other time during the second period of surveillance.

39.     Richards' observed behavior and functionality on video were inconsistent with his subjective reports to Dr. Pietruszka during the IME, which occurred during the very same time period.

### 4.    Transamerica's Third Period of Surveillance

40.     In September 2019, Transamerica performed a third period of surveillance on Richards.  On each date of surveillance, Defendants represented to Transamerica in Proof of Loss statements that Richards received between two and nine hours of paid care services from Gurich in the home.  These Proof of Loss statements included the times each day when Gurich allegedly provided care, plus a written description of the specific care services Gurich allegedly provided.  As with all Proof of Loss statements at issue in this litigation, these submissions were provided by Defendants to Right at Home with knowledge and intent that Right at Home would cause them to be transmitted to Transamerica in support of the claim, and that Transamerica would rely on them to pay benefits to Richards.  Acting in reliance on these Proof of Loss statements, Transamerica did, in fact, pay benefits to Richards.

41.     Transamerica's surveillance revealed that, despite allegedly suffering from significant functional limitations, Richards was regularly outside the home alone, often for extended periods of time on dates and at times when Defendants represented to Transamerica that Gurich was providing paid care to Richards in the home.  Similarly, Gurich was often away from the home during time periods when Defendants represented that Gurich was providing care to Richards in the home. Transamerica was falsely induced to pay benefits for these time periods because covered care services were not actually being provided.

42.     Moreover, the video showed Richards behaving with a higher degree of independence and functionality than represented to Transamerica.  He performed

COZEN O'CONNOR
601 S. FIGUEROA STREET, SUITE 3700
LOS ANGELES, CA 90017

movements and tasks directly analogous to ADLs without assistance.  The video was inconsistent with the notion that Richards was Unable to Perform any of his ADLs.

### 5. Representations to Doctors During Surveillance Period

43.    During the same time period when Transamerica performed its third period of surveillance, Richards was being evaluated for a routine surgical procedure on his knee.

44.    In preparation for that procedure, and then following the procedure, Richards met with and was evaluated by a significant number of doctors, physical therapists and other medical professionals.

45.    Richards was asked specific questions concerning his functionality, ability to perform ADLs, care needs and actual receipt of care by these medical professionals in connection with their evaluation, treatment and rehabilitation processes.

46.    Richards made representations to these medical professionals that cannot be reconciled with his representations to Transamerica concerning the very same issues.

47.    During this very same time period, Defendants were continuing to seek and be paid benefits for care services based on their ongoing representations that Richards needed, received and paid for care services from Gurich many hours each day.

### 6. Transamerica's Fourth Period of Surveillance

48.    In January 2020, Transamerica performed a fourth period of surveillance on Richards.  On each date of surveillance, Defendants represented to Transamerica in Proof of Loss submissions that Richards received nine hours of paid services from Gurich in the home.  These Proof of Loss statements included the times each day when Gurich allegedly provided care, plus a written description of the specific care services Gurich allegedly provided.  As with all Proof of Loss statements at issue in this litigation, these submissions were provided by Defendants to Right at Home with

COZEN O'CONNOR
601 S. FIGUEROA STREET, SUITE 3700
LOS ANGELES, CA 90017

knowledge and intent that Right at Home would cause them to be transmitted to Transamerica in support of the claim, and that Transamerica would rely on them to pay benefits to Richards. Acting in reliance on these Proof of Loss submissions, Transamerica did, in fact, pay benefits to Richards.

49. Transamerica's surveillance revealed that, despite allegedly suffering from significant functional limitations, Richards was regularly outside the home alone, often for extended periods of time on dates and at times when Defendants represented to Transamerica that Gurich was providing paid care to Richards in the home. Similarly, Gurich was often away from the home during time periods when Defendants represented that Gurich was providing care to Richards in the home. Transamerica was falsely induced to pay benefits for these time periods because covered care services were not actually being provided.

50. Moreover, the video showed Richards behaving with a higher degree of independence and functionality than represented to Transamerica. He performed movements and tasks directly analogous to ADLs without assistance. The video was inconsistent with the notion that Richards was Unable to Perform any of his ADLs.

51. During the fourth period of surveillance, Transamerica also expanded its investigative efforts to include Gurich. In other words, Transamerica assigned an investigator to Gurich on the same dates and during the same time periods when another investigator was performing surveillance on Richards. Transamerica's surveillance on Gurich confirmed that Gurich did not provide care to Richards on the dates represented Defendants to Transamerica.

52. In fact, Gurich was frequently seen doing things like going to the movies alone, going to Malibu Fitness on multiple dates, going jogging, going to UPS and Best Buy, grocery shopping and being away from the home on multiple dates for up to five hours at a time while representing that he was providing care to Richards in the home and seeking benefits from Transamerica for the same.

COZEN O'CONNOR
601 S. FIGUEROA STREET, SUITE 3700
LOS ANGELES, CA 90017

COZEN O'CONNOR
601 S. FIGUEROA STREET, SUITE 3700
LOS ANGELES, CA 90017

### 7.    Representation to Physical Therapists During Surveillance Period

53.    Richards participated in at least 10 physical therapy sessions in January 2020 at Westlake Physical Therapy.

54.    During each and every one of these sessions, Richards represented to his physical therapy provider that he *was not* receiving home health care.

55.    Richards made additional representations that cannot be reconciled with his representations to Transamerica concerning his functionality and receipt of care during the same time period.

56.    All the while, of course, Defendants were continuing to report to Transamerica that Richards needed and received many hours of care services from Gurich each day in the home, and were paid benefits for the same.

### 8.    Richards Undergoes a Second Independent Medical Examination

57.    Transamerica determined that it was necessary and appropriate to schedule Richards for a second IME in accordance with Transamerica's rights under the Certificate.

58.    The second IME took place on June 4, 2020 and was performed by Dr. Katrina Vlachos, who is board certified in Physical Medicine and Rehabilitation, and who had no prior relationship with Richards or Transamerica.

59.    Based in large part on Richards' subjective representations during the second IME, Dr. Vlachos opined that Richards was Unable to Perform one ADL and was borderline with a second.

60.    Due to the fact that Transamerica's investigation was ongoing, Transamerica continued to pay benefits while it investigated the claim further.

### 9.    Transamerica's Fifth Period of Surveillance

61.    Transamerica performed a fifth period of surveillance on Richards in June 2020, including the dates of the second IME and days before and after the second

IME. On each date of surveillance, Defendants represented to Transamerica in Proof of Loss submissions that Richards received between five and nine hours of paid services from Gurich in the home. These Proof of Loss statements included the times each day when Gurich allegedly provided care, plus a written description of the specific care services Gurich allegedly provided. As with all Proof of Loss statements at issue in this litigation, these submissions were provided by Defendants to Right at Home with knowledge and intent that Right at Home would cause them to be transmitted to Transamerica in support of the claim, and that Transamerica would rely on them to pay benefits to Richards. Acting in reliance on these Proof of Loss submissions, Transamerica did, in fact, pay benefits to Richards.

62. Transamerica's surveillance revealed that, despite allegedly suffering from significant functional limitations, Richards was regularly outside the home alone, often for extended periods of time on dates and at times when Defendants represented to Transamerica that Gurich was providing paid care to Richards in the home. Similarly, Gurich was often away from the home during time periods when Defendants represented that Gurich was providing care to Richards in the home. Transamerica was falsely induced to pay benefits for these time periods because covered care services were not actually being provided.

63. Moreover, the video showed Richards behaving with a higher degree of independence and functionality than represented to Transamerica. He performed movements and tasks directly analogous to ADLs without assistance. The video was inconsistent with the notion that Richards was Unable to Perform any of his ADLs.

64. Curiously, the only date during the second surveillance period when Richards and Gurich were seen together was on June 10 – the date of the second IME. Gurich accompanied Richards to the second IME. This was done to give Dr. Vlachos and, in turn, Transamerica the false impression that Richards needed and was receiving care from Gurich as represented to Transamerica. Aside from

accompanying Richards to the second IME, Gurich and Richards were not seen together on any date or at any other time during the fifth period of surveillance.

65.    Richards' observed behavior and functionality on video could not be reconciled with his subjective reports to Dr. Vlachos during the IME, which occurred during the very same time period.

### 10.    Transamerica's Sixth Period of Surveillance

66.    Transamerica performed a firth period of surveillance on Richards in August and September 2020.  On each date of surveillance, Defendants represented to Transamerica in Proof of Loss submissions that Richards received between three and nine hours of paid services from Gurich in the home.  These Proof of Loss statements included the times each day when Gurich allegedly provided care, plus a written description of the specific care services Gurich allegedly provided.  As with all Proof of Loss statements at issue in this litigation, these submissions were provided by Defendants to Right at Home with knowledge and intent that Right at Home would cause them to be transmitted to Transamerica in support of the claim, and that Transamerica would rely on them to pay benefits to Richards.  Acting in reliance on these Proof of Loss submissions, Transamerica did, in fact, pay benefits to Richards.

67.    Transamerica's surveillance revealed that, despite allegedly suffering from significant functional limitations, Richards was regularly outside the home alone, often for extended periods of time on dates and at times when Defendants represented to Transamerica that Gurich was providing paid care to Richards in the home.  Similarly, Gurich appears to have been away from the home during the entirety of all time periods when Defendants represented that Gurich was providing care to Richards in the home.  Transamerica was falsely induced to pay benefits for these time periods because covered care services were not actually being provided.  In fact, Defendants were never once seen together on any date or at any time during the entire period of surveillance.

COZEN O'CONNOR
601 S. FIGUEROA STREET, SUITE 3700
LOS ANGELES, CA 90017

68.    Moreover, the video showed Richards behaving with a higher degree of independence and functionality than represented to Transamerica.  He performed movements and tasks directly analogous to ADLs without assistance.  The video was inconsistent with the notion that Richards was Unable to Perform any of his ADLs.

69.    During the sixth period of surveillance, Transamerica once again expanded its investigative efforts to include Gurich.  In other words, Transamerica assigned an investigator to Gurich on the same dates and during the same time periods when another investigator was performing surveillance on Richards.  Transamerica's surveillance on Gurich confirmed that Gurich did not provide care to Richards on the dates represented Defendants to Transamerica.

70.    In fact, Gurich was not observed at any time during the entire week of surveillance.  His car was never even seen at Richards' home.

71.    Defendants nevertheless represented to Transamerica that care services were being provided by Gurich to Richards in the home each day.  Defendants were paid benefits based on these representations.

**11.    Transamerica's Seventh and Final Period of Surveillance**

72.    In January 2021, Transamerica performed a seventh and final period of surveillance on Richards.  On each date of surveillance, Defendants represented to Transamerica in Proof of Loss submissions that Richards received between three and nine hours of paid services from Gurich in the home.  These Proof of Loss statements included the times each day when Gurich allegedly provided care, plus a written description of the specific care services Gurich allegedly provided.  As with all Proof of Loss statements at issue in this litigation, these submissions were provided by Defendants to Right at Home with knowledge and intent that Right at Home would cause them to be transmitted to Transamerica in support of the claim, and that Transamerica would rely on them to pay benefits to Richards.  Acting in reliance on these Proof of Loss submissions, Transamerica did, in fact, pay benefits to Richards.

73.     Transamerica's surveillance revealed that, despite allegedly suffering from significant functional limitations, Richards was regularly outside the home alone, often for extended periods of time on dates and at times when Defendants represented to Transamerica that Gurich was providing paid care to Richards in the home. Similarly, Gurich was often away from the home during time periods when Defendants represented that Gurich was providing care to Richards in the home. Transamerica was falsely induced to pay benefits for these time periods because covered care services were not actually being provided. In fact, Defendants were never once seen together on any date or at any time during the entire period of surveillance.

74.     Moreover, the video showed Richards behaving with a higher degree of independence and functionality than represented to Transamerica. He performed movements and tasks directly analogous to ADLs without assistance. The video was inconsistent with the notion that Richards was Unable to Perform any of his ADLs.

75.     During the seventh period of surveillance, Transamerica also expanded its investigative efforts to include Gurich. In other words, Transamerica assigned an investigator to Gurich on the same dates and during the same time periods when another investigator was performing surveillance on Richards. Transamerica's surveillance on Gurich confirmed that Gurich did not provide care to Richards on the dates represented Defendants to Transamerica.

76.     In fact, Gurich was frequently seen alone doing things like going to the beach, gym and grocery store, going jogging and being away from the home on multiple dates for at a time while representing that he was providing care to Richards in the home and seeking benefits from Transamerica for the same.

## 12.     Recurring Care Descriptions in Proof of Loss were False

77.     As discussed, Defendants were required to, and did, submit Proof of Loss to Transamerica in order to be paid benefits under the Certificate.

78.    Among the materials that were required and provided were daily care notes that described the specific care services allegedly provided by Gurich.  Each of these care notes was one full paragraph in length and gave a significant amount of detail about Richards and the care services provided by Gurich on each alleged date of care.  Transamerica relied on these care notes in evaluating the claim and paying benefits for each date when care was allegedly provided.

79.    Curiously, these daily care notes included just 10 distinct entries, despite care having allegedly been provided on hundreds of individual dates.  A factually-distinct care note would have been expected for each individual date of service in which the services provided on that date were described.  Rather than providing care notes that actually reflected the true care services provided on each date, if any, Defendants simply recycled and resubmitted the same 10 care notes over and over, word for word, over the life of the claim.  In other words, they simply selected one of their pre-drafted care notes (as if pulling it out of a hat at random) and applied it to each care date.  Defendants submitted one of these 10 care notes to Transamerica in support of each day of care for which benefits were claimed.

80.    Given the amount of detail included in each of these care notes, it was not factually plausible that the care notes reflected the true care services provided to Richards on the correct dates of the claim, lest Defendants were somehow living in a real life version of the movie "Groundhog Day."  Obviously, they were not.

81.    Indeed, Transamerica's suspicion proved correct.  The daily care notes cannot be reconciled with Transamerica's surveillance video, Richards' medical records and other sources of information in Transamerica's possession.

82.    It is clear that Defendants simply provided Transamerica with false Proof of Loss in regard to the care services allegedly rendered on each date of the claim in order to give Transamerica the false impression that care services were being provided when, in fact, they were not.

16

83.    Transamerica would not have paid benefits without Proof of Loss and, in fact, was deceived by the information provided by Defendants.

**13.    Telephone Call with Defendants**

84.    In February 2021, Transamerica called Richards on a recorded line to ask about certain aspects of the claim.  After advising that the call was being recorded, Richards and Gurich both participated on speakerphone.

85.    Defendants represented that Gurich provided care approximately 40 hours per week.  They also represented that Gurich assisted Richards with tasks like using the bathroom, shopping and dressing – tasks that Richards could perform independently as documented in Transamerica's video surveillance and Richards' representations to his own doctors and other health care providers.

86.    Richards specifically represented that he was not able to drive a car. This, of course, was false, as he was seen driving a car during substantially every period of surveillance.

87.    Richards also represented that Gurich does not charge for care services. The Certificate offers a reimbursement benefit, meaning Transamerica is only obligated to pay benefits equal to Richards' actual, out of pocket costs for covered care services actually provided by Gurich.

**14.    Transamerica Closes its Investigation**

88.    Based on all information in its possession, Transamerica closed its investigation and determined that Defendants had, in fact, engaged in fraud.

89.    Transamerica has paid Defendants a total of $269,452.20 in benefits over the life of the claim.  On information and belief, most or all of those benefits were paid as a direct result of Defendants' fraud and are subject to recovery in this lawsuit.

90.    Each of the Defendants was aware of and ratified the unlawful conduct of the other Defendant.  Their conduct was part of a common plan, scheme and design to defraud Transamerica of insurance benefits and was therefore a conspiracy.  As described, each Defendant committed multiple acts in furtherance of the conspiracy.

COZEN O'CONNOR
601 S. FIGUEROA STREET, SUITE 3700
LOS ANGELES, CA 90017

Thus, Defendants are jointly and severally liable to Transamerica for their own acts and the acts of the other co-conspirator.

91.    Defendants' conduct was protracted and egregious, and was of such a nature that it shocks the conscience and justifies an award of punitive damages in addition to compensatory damages.

92.    Moreover, Transamerica is entitled to a declaration that the Certificate is void under the inherent power of the Court to adjust the equities between the parties due to (a) Defendants' breach of the implied covenant of good faith and fair dealing between the parties; and (b) as a means of compensating Transamerica for a portion of its losses.

## COUNT I – FRAUD
### (Against all Defendants)

93.    Transamerica incorporates the preceding paragraphs of the complaint as though set forth fully herein.

94.    Defendants, acting with a common plan, scheme and design, did knowingly and intentionally misrepresent, or cause to be misrepresented, material facts to Transamerica as described in this Complaint, in the following ways:

a)    Creating and perpetuating the false impression that Gurich provided care to Richards on dates and at times when, in fact, no care was provided;

b)    Creating the impression that Richards was Unable to Perform two or more ADLs without substantial assistance when, in fact, he was fully capable of performing all ADLs;

c)    Creating and perpetuating the false impression that Richards' care needs were greater than they were in-fact;

d)    Creating and perpetuating the false impression that Richards' functionality was far worse than it was in-fact;

e)    Creating and perpetuating the false impression that Gurich was a legitimate employee of Right at Home when, in fact, Gurich's

COZEN O'CONNOR
601 S. FIGUEROA STREET, SUITE 3700
LOS ANGELES, CA 90017

18

relationship with Right at Home existed for the sole purpose of overcoming the Certificate's prohibition on covered care being provided by members of Richards' Immediate Family so the fraud would be harder for Transamerica to detect;

f)  Creating and perpetuating the false impression that Richards was unable to perform certain instrumental activities of daily living such as driving a car or shopping for groceries, which, though not specifically determinative of his eligibility for benefits under the Rider, were used by Transamerica to evaluate Richards' overall functionality and limitations;

g)  Creating and perpetuating the false impression that Gurich provided specific kinds of care services to Richards on specific dates when, in fact, he did not do so;

h)  Creating and perpetuating the false impression that Defendants compensated Gurich for his services in the amounts represented to Transamerica when, in fact, he was not compensated as represented to Transamerica.

95.  Defendants made and perpetuated these misrepresentations repeatedly over a continuous period more than two years with knowledge of their falsity.

96.  Defendants made and perpetuated these misrepresentations with knowledge and intent that the false information would be relied upon by Transamerica for their benefit and to Transamerica's detriment.

97.  Transamerica relied on Defendants' misrepresentations and was justified in its reliance.

98.  As a direct and proximate result of Defendants' fraudulent misrepresentations, Transamerica was harmed by paying benefits in the amount of $269,452.20 that Defendants were not lawfully entitled to receive.

99.    Defendants each received a portion of the benefit payments in exchange for participating in the scheme against Transamerica.

100.    Transamerica incurred additional losses in an amount to be determined at trial relating to its cost of investigating the claim.

## COUNT II – CIVIL THEFT
### (Against all Defendants)

101.    Transamerica incorporates the preceding paragraphs of the complaint as though set forth fully herein.

102.    Defendants, and each of them individually, knowingly and intentionally deprived Transamerica of insurance benefits totaling $269,452.20 that should not and would not have been paid but for Defendants' fraud and deceit.

103.    Defendants had no lawful right to receive this money, or to retain possession of the money once it was received.

104.    Notwithstanding the absence of any right to receive or retain possession of the money, Defendants did, in fact, receive and retain possession of the money.

105.    Defendants' receipt and retention of the money constituted a theft.

106.    Defendants knew that the money was received through fraud and deceit, and that Transamerica would not have paid the money had it known the true facts about Richards' claim at the inception of the claim.  Thus, Defendants knew the money they received from Transamerica was stolen.

107.    As a result of this theft, Defendants are liable to Transamerica in the amount of $269,452.20, plus interest, statutory treble damages, fees and costs.

## COUNT III – CIVIL CONSPIRACY
### (Against all Defendants)

108.    Transamerica incorporates the preceding paragraphs of the complaint as though set forth fully herein.

109.    Defendants    knowingly    and    intentionally    formed    an    operated    a conspiracy with the common plan, scheme and design of extracting insurance benefits from Transamerica through fraud and deceit.

110.   Each of the Defendants was aware of and ratified the conduct of the other participants in the conspiracy.

111.   Each of the Defendants performed one or more wrongful acts in furtherance of the conspiracy.

112.   As a result of the conspiracy, Transamerica was harmed by paying $269,452.20 in benefits that it would not have paid if it knew the true facts about Richards' claim from the inception of the claim.

<u>**COUNT IV – NEGLIGENCE**</u>
**(Against all Defendants)**

113.   Transamerica incorporates the preceding paragraphs of the complaint as though set forth fully herein.

114.   Defendants, and each of them individually, had an ongoing duty to provide true and correct information to Transamerica concerning Richards' functionality, claim for benefits under the Certificate, alleged receipt of care and alleged compensation for the same.

115.   By providing false information to Transamerica as described in this Complaint, Defendants breached their duties to Transamerica.

116.   Transamerica reasonably relied to its detriment on the false information supplied by Defendants, paying insurance benefits Defendants were not lawfully entitled to receive.

117.   Thus, the false information supplied by Defendants to Transamerica both caused and proximately caused harm to Transamerica.

118.   Transamerica was damaged in the amount of $269,452.20, which Transamerica would not have paid but for Defendants' submission of false information.

<u>**COUNT V – RESTITUTION OF BENEFITS PAID**</u>
**(Against all Defendants)**

119.   Transamerica incorporates the preceding paragraphs of the complaint as though stated fully herein.

120.    Transamerica has no present obligation to pay benefits under the Certificate due to one or more of: (1) Richards' lack of a qualifying ADL deficiency; (2) Richards' failure to receive care from any caregiver; (3) Richards' failure to receive the care represented to Transamerica; and/or (4) Richards' failure to pay for the care he received, if any.

121.    Transamerica had no obligation to pay benefits under the Certificate during some or all of the period of Defendants' claim due to one or more of: (1) Richards' lack of a qualifying ADL deficiency; (2) Richards' failure to receive care from any caregiver; (3) Richards' failure to receive the care represented to Transamerica; and/or (4) Richards' failure to pay for the care he received, if any.

122.    Because Transamerica has made an overpayment of benefits, Transamerica is entitled to restitution in the amount of the benefits paid by Transamerica since a date to be determined by the Court.

## COUNT VI – DECLARATION THAT THE CERTIFICATE IS VOID
### (Against Richards)

123.    Transamerica incorporates the preceding paragraphs of the complaint as though set forth fully herein.

124.    Insurance contracts are agreements *uberrimae fidei* and are undergirded by a mutual implied covenant of good faith and fair dealing.

125.    By initiating and perpetuating a protracted fraud against Transamerica, Richards has breached the implied covenant and demonstrated that he is incapable of proceeding in good faith in an ongoing contractual relationship with Transamerica.

126.    Accordingly, the Court should declare the Certificate void in three respects.

127.    First, it is necessary and appropriate for the Court to exercise its inherent power to adjust the equities between the parties by declaring the Certificate void so Transamerica is not forced to remain in contractual privity with a party, Richards, who

COZEN O'CONNOR
601 S. FIGUEROA STREET, SUITE 3700
LOS ANGELES, CA 90017

1   has acted in bad faith and may attempt to commit additional frauds against

2   Transamerica in the future.

3       128.   Second, it is necessary and appropriate for the Court exercise its

4   equitable powers to declare the Certificate void as a means of compensating

5   Transamerica for a portion of the losses attributable to Defendants' fraudulent

6   conduct.

7       129.   And, third, Transamerica is entitled to a declaration that the Certificate

8   void under California black letter law, including:

9       a)    Cal. Civ. Code § 3412, due to Defendants' fraud and, as a result,

10              Transamerica's reasonable apprehension of serious injury,

11              including additional pecuniary loss, or the prejudicial alteration of

12              Transamerica's position, in the event Transamerica is required to

13              remain in contractual privity with Richards;

14      b)    Cal. Civ. Code § 1689, because the Certificate is unlawful for

15              causes that do not appear in their terms or conditions; and because

16              the public interest will be prejudiced by permitting the Certificate

17              to stand; and/or

18      c)    Cal. Ins. Code § 359, which requires the Certificate to be voided

19              as of the earliest date on which either Defendant misrepresented

20              any material fact to Transamerica concerning the claim.

21      130.   There is an actual, present and justiciable controversy between the

22   parties as to whether the Certificate is void for which there is no adequate remedy at

23   law.

24      **WHEREFORE**, Transamerica respectfully demands the following relief:

25      1.    Actual and compensatory damages in an amount to be determined at

26   trial, plus interest;

27      2.    Punitive damages;

28      3.    Statutory treble damages;

COZEN O'CONNOR
601 S. FIGUEROA STREET, SUITE 3700
LOS ANGELES, CA 90017

4.    Attorney's fees;

5.    The costs of litigation;

6.    A judicial declaration that the Certificate is void;

7.    A judicial declaration that Transamerica may retain some or all of the premium paid for the Certificate;

8.    Restitution of benefits paid under the Certificate since a date to be determined by the Court;

9.    Such other relief as may be demonstrated at trial; and

10.    Such other relief as the Court deems just and proper.

DATED:    1/13/2022        COZEN O'CONNOR


By:_____/s/ Valerie D. Rojas_____
   Valerie D. Rojas
   Michael Rafalko (*Pro Hac Vice to be filed*)
   Allison B. Goldis (*Pro Hac Vice to be filed*)
   *Attorneys for Plaintiff*
   TRANSAMERICA LIFE INSURANCE COMPANY

COZEN O'CONNOR
601 S. FIGUEROA STREET, SUITE 3700
LOS ANGELES, CA 90017